UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

KATYA ROQUE-GOMEZ,

       Petitioner,

v.                      Case No: 2:14-cv-398-FtM-29DNF

IRINEO TELLEZ-MARTINEZ,

       Respondent.

_____

**OPINION AND ORDER**

    This matter comes before the Court on Petitioner Katya Roque-Gomez's Petition for Return of Minor Child (Doc. #1) filed on July 18, 2014. Respondent Irineo Tellez-Martinez filed an Answer and Affirmative Defenses (Doc. #16) on September 22, 2014. After ordering expedited pretrial proceedings, the Court conducted a bench trial on November 14, 2014.

    The Petition is filed pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670 1343 U.N.T.S. 97, reprinted in 51 Fed. Reg. 10,493 (Mar. 26, 1986) and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 et seq. Petitioner alleges that Respondent wrongfully removed B.T.R., their eleven year old son, from the Republic of Mexico and has wrongfully retained him in the United States. Respondent counters that the habitual residence of B.T.R. was in

Florida, not Mexico; Petitioner was not exercising her custodial rights at the time of the allegedly wrongful retention; Petitioner consented to the removal of the child from Mexico and subsequently acquiesced to the retention of B.T.R.; B.T.R. objects to being returned to Mexico and has attained an age and degree of maturity sufficient for the Court to take his opinion into account; and this action was commenced more than one year after the date of the alleged wrongful removal and retention and the child is now settled in his new environment.[1]

## I.

The general principles relating to the Hague Convention are well-settled.   To address the harm done to children[2] by international parental kidnapping/retention, the Hague Convention is designed to restore the factual status quo and protect the legal rights of the non-abducting/retaining parent.   The stated objectives of the Hague Convention are (1) to "secure the prompt return of children wrongfully removed to or retained in any Contracting State," and (2) to "ensure that rights of custody and of access under the law of one Contracting State are effectively

---

[1]Respondent originally asserted seven affirmative defenses, but withdrew his Sixth and Seventh Affirmative Defenses during the bench trial.

[2]The Hague Convention effectively defines "children" as being under 16 years of age.   When a child attains the age of 16 years, the Hague Convention ceases to apply.   Hague Convention art. 4.

respected in other Contracting States." <u>Lops v. Lops</u>, 140 F.3d 927, 935 (11th Cir. 1998) (quoting Hague Convention art. 1); <u>see also</u> <u>United States v. Newman</u>, 614 F.3d 1232, 1235-36 (11th Cir. 2010); <u>Baran v. Beaty</u>, 526 F.3d 1340, 1344 (11th Cir. 2008); <u>Pielage v. McConnell</u>, 516 F.3d 1282, 1286 (11th Cir. 2008). Thus, a court considering a petition for the return of a child under the Hague Convention and ICARA "has jurisdiction to decide the merits only of the wrongful removal [or retention] claim, not of any underlying custody dispute . . . The Hague Convention is intended to 'restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.'" <u>Lops</u>, 140 F.3d at 936 (citations omitted) (quoting <u>Friedrich v. Friedrich</u>, 78 F.3d 1060, 1064 (6th Cir. 1996)); <u>see also</u> <u>Baran</u>, 526 F.3d at 1344.

The Hague Convention mandates the return of children to their prior circumstances if one parent's removal or retention violated the custody rights of the other parent and was therefore "wrongful." Hague Convention art. 12; 22 U.S.C. § 9001(a)(4). The removal or retention of a child is "wrongful" where it (1) violates the "rights of custody" of the non-abducting/non-retaining person "under the law of the State in which the child was habitually resident immediately before the removal or retention," and (2) the rights of custody were actually being

exercised at the time of the removal or retention, or would have been exercised but for the removal or retention.  Hague Convention art. 3; <u>Pielage</u>, 516 F.3d at 1286-87; <u>Lops</u>, 140 F.3d at 935. Therefore, a petitioner establishes the elements of wrongful removal or retention by demonstrating by a preponderance of the evidence[3] that: (1) the habitual residence of the child immediately before the date of the allegedly wrongful removal or retention was in the country to which return is sought; (2) the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (3) the petitioner was actually exercising or would have been exercising custody rights of the child at the time of his or her removal or retention. <u>Chafin v. Chafin</u>, 742 F.3d 934, 938 (11th Cir. 2013); <u>Ruiz v. Tenorio</u>, 392 F.3d 1247, 1251 (11th Cir. 2004); <u>Lops</u>, 140 F.3d at 935-36.  If petitioner meets this burden, the child who is wrongfully removed or retained must be promptly returned.  <u>Lops</u>, 140 F.3d at 935-36; <u>see also</u> <u>Abbott v. Abbott</u>, 560 U.S. 1, 8-9 (2010).

The general rule that a wrongfully removed or retained child must be returned is subject to six exceptions, each of which may excuse the return of the child.  Hague Convention art. 12, 13, 20. A court is not bound to order the return of a child if respondent

---

[3] 22 U.S.C. § 9003(e)(1)(A); <u>Pielage</u>, 516 F.3d at 1286.

demonstrates by a preponderance of the evidence[4] that: (1) the person having care of the child was not actually exercising their custody rights at the time of removal or retention; (2) the person having care of the child had consented to or subsequently acquiesced in the removal or retention of the child; (3) "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views"; or (4) the proceedings were commenced more than one year after the date of the wrongful removal or retention and "the child is now settled in its new environment."  Hague Convention art. 12, 13. Additionally, a court is not bound to order the return of a child if respondent demonstrates by clear and convincing evidence[5] that: (5) there is a grave risk that the child's return would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation"; or (6) return of the child would not be permitted by fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.  Hague Convention art. 13, 20.  These "affirmative defenses" are narrowly construed to effectuate the purpose of the Hague Convention.  See, e.g., Baran, 526 F.3d at 1345.  Even if an exception is established, the Court has discretion to order the

---

[4]22 U.S.C. § 9003(e)(2)(B).

[5]22 U.S.C. § 9003(e)(2)(A).

return of a child if return would further the aims of the Hague Convention.  See Miller v. Miller, 240 F.3d 392, 402 (4th Cir. 2001); England v. England, 234 F.3d 268, 270-71 (5th Cir. 2000); Friedrich, 78 F.3d at 1067; Feder v. Evans-Feder, 63 F.3d 217, 226 (3d Cir. 1995).

## II.

Based upon the evidence and testimony that the Court found to be credible, the Court makes the following findings of fact:

Katya Roque-Gomez (Petitioner) and Irineo Tellez-Martinez (Respondent) are natural born citizens of Mexico; neither is a United States citizen.  Respondent entered the United States illegally in 1999; it is unclear when Petitioner first came to the United States, but she also entered illegally.  At the time of Petitioner's entry into the United States, she was lawfully married in Mexico to another man and there is no evidence that the marriage has ever been dissolved.

Petitioner met Respondent in either September or November 2002, and they began dating. In January 2013, Petitioner became pregnant.  Respondent testified that he told Petitioner he would be responsible for the child, and asked if she wanted to marry him.  Petitioner told Respondent she could not marry him because she was already married in Mexico.  Petitioner and Respondent began living together in Fort Myers, Florida, and Petitioner gave

birth to their first son, B.T.R., on September 24, 2003.  The parties' second son, K.T.R. (collectively with B.T.R., the "children") was born three years later on September 12, 2006. Both children were born in Lee County, Florida, and are citizens of the United States, as well as Mexican nationals.[6]  Respondent is the biological father of both children, and is identified as their father on the respective birth certificates.  Joint Ex. 1, 6.[7]

Petitioner and Respondent never married due to Petitioner's existing marriage.  Nonetheless, they lived as a family unit in Lee County, Florida from early 2003 to August 2008.  B.T.R. was enrolled in school in Lee County, Joint Ex. 4, obtained regular medical treatment in Lee County, Joint Ex. 3, and participated in normal family activities during these years.  Petitioner's two younger siblings also lived with them, and in 2008, Respondent bought a house in Cape Coral, Florida in which they were all going to reside.

---

[6]A Florida attorney certified in immigration law testified at trial that under Mexican law, a person born outside Mexico will be a Mexican national if a parent was born in Mexico.  While the child acquires Mexican nationality at birth by operation of Mexican law, the child must be registered for the nationality to be recognized by the Mexican government.  When the child turns eighteen, he or she acquires Mexican citizenship.

[7]Petitioner testified she has a third child, L.B., apparently born subsequently in Mexico, and Petitioner identified Jose Luis Sanchez as that child's father.

In August 2008, Petitioner decided to return to Hidalgo, Mexico with her two children.  Respondent purchased bus tickets for Petitioner and their two children, and both Petitioner and Respondent executed a Power of Attorney authorizing Petitioner "to travel with our sons between the United States and Mexico and to have temporary custody of them in reference to health care, hospitalization and all parental type responsibilities."  Joint Ex. 10.

The parties disagree on the purpose and anticipated duration of this move.  Petitioner testified she went to Mexico because she wanted to see her family and because she had an abnormal pap smear test result and wanted medical care.  Petitioner further testified that this was a permanent move, and that Respondent agreed that she and the children would live in Mexico permanently.  According to Petitioner, Respondent agreed he would come to Mexico in December 2008, and in the meantime would send her money. Petitioner took all of her siblings' belongings and her children's passports, but did not take all of her belongings or those of the children.

Respondent, on the other hand, testified he never agreed that Petitioner could permanently remove the children from Florida to Mexico, and that this was to be a temporary move which would allow Petitioner to visit her mother and take her younger siblings back

to Mexico, and allow their children to visit their grandmother. Respondent testified that both Petitioner and the children were to return to the United States after a few months, in time for school in the United States.   B.T.R. was enrolled in elementary school in Cape Coral, Florida, beginning January 2009.   Joint Exhibit 4. Respondent further testified that while Petitioner initially told him she was going to see her mother for a month, she later admitted she had lied, she wanted to settle in Mexico, and she was not going to return the children.   Respondent denied stating that he intended to move back to Mexico, or join Petitioner in December 2008 in Mexico.   There was no evidence that Respondent has returned to Mexico.

Petitioner began living at her mother's house with her mother, her two siblings, and two of her children in Hidalgo, Mexico. When she arrived in Mexico in August 2008, Petitioner set up a mobile kitchen with her mother, then obtained various other employment.   B.T.R. developed normal family ties in Mexico and acclimated to Hidalgo as his new residence.   B.T.R. lived with his mother and the others, attended and did well in school, Joint Exhibit 5, attended church, received regular medical care at a health center, played on organized basketball and soccer teams, and developed friendly relationships with family members and other children.   Respondent had weekly telephone calls with his children

for the first six months.  After that, Petitioner told Respondent he had no permission to speak with the children and his relationship with Petitioner terminated.  From August 2008 until approximately April 2012, Respondent regularly sent money orders to Petitioner in Mexico to aid in the care of the children.  Joint Ex. 12.  Respondent testified that from August 2008 until June 2012, he would call Petitioner weekly to discuss how the children were doing and other things.  Respondent took no legal action to obtain the return of his children to the United States.

Petitioner testified her relationship with Respondent came to end in February 2009, because of his infidelity.  Respondent denied any such infidelity.

In 2010, Respondent married Bertha Alicia Tafoya, a United States citizen, and currently resides with his wife, son, and stepdaughter in Cape Coral, Florida.  Respondent, through counsel, has filed a petition with United States immigration authorities to obtain legal status as the spouse of a United States citizen.  Joint Ex. 11.  That application has been approved, and Respondent's waiver of the penalty for his illegal entry is to be submitted by counsel; while this does not change his illegal status, there have been no attempts to deport Respondent despite his disclosure to the government of his presence in the United States and the address at which he is residing.  Joint Ex. 11.

Respondent filed an income tax return for 2012, Joint Ex. 9, and does not anticipate any deportation effort while his application is pending.

Both parties agree that for approximately a year prior to August 2012, Respondent began insisting that Petitioner send his children to Florida for "vacation."  Petitioner would not send both children at the same time, but agreed to send B.T.R. for a two month summer vacation on the condition that B.T.R. then be returned to Mexico.  If B.T.R. was returned, Petitioner would allow their other son, K.T.R., to go to Florida in December 2012, on vacation.  Respondent caused the purchase of roundtrip airfare for B.T.R., who arrived in Miami, Florida on June 12, 2012, and was set to return to Mexico on August 21, 2012.  Shortly after B.T.R.'s arrival in Florida, Respondent purchased B.T.R. a cellular phone so he could remain in contact with Petitioner.

Respondent testified that immediately upon B.T.R.'s arrival, Respondent noticed that something was wrong with his son's teeth. A dentist subsequently found that B.T.R. had multiple (14) cavities.  Respondent informed Petitioner that he could not send B.T.R. back to Mexico on August 21, as previously agreed, because B.T.R. was in need of dental care that would take ten months to complete.  Respondent testified that after he told Petitioner about the needed dental work, they agreed that the work would be

finished in the United States and B.T.R. would then be returned to Mexico in December 2012.  Petitioner, on the other hand, testified that she told Respondent she could obtain dental care in Mexico, and Respondent should return B.T.R. to Mexico as agreed.

Medical records reflect that the first dental examination occurred on August 29, 2012, and the dentist was informed that B.T.R. just came back from three years in Mexico and some of his teeth hurt.  Joint Ex. 2.  B.T.R. received dental treatments on seven (7) subsequent dates, ending on December 31, 2012.  Joint Ex. 2.  B.T.R. next had a dental examination approximately eighteen months later on June 20, 2014, followed by six (6) treatments in July and August 2014.  Joint Ex. 2.  Respondent testified that the dental work was still not complete as of the trial date because B.T.R. needed a root canal.

Petitioner denied any agreement for a delayed return of B.T.R. to Mexico past August 21, 2012, and testified that after her son was not returned in August as agreed, she begged for B.T.R.'s return, but Respondent refused.  Petitioner subsequently attempted to illegally enter the United States to retrieve B.T.R., but was detained at the border.  When she returned to Hidalgo, Mexico, Petitioner went to the Ministry of Foreign Relations for assistance on obtaining the return of her son.  Petitioner testified that she

never agreed that B.T.R. could stay in Florida permanently, and continued to unsuccessfully ask Respondent to return him to Mexico.

Respondent testified that Petitioner sent him a letter saying he needed to send B.T.R. back to Mexico or face a kidnapping charge, which caused him to hire an attorney for advice.  On August 24, 2012, Respondent's attorney filed a Petition to Establish Paternity in the Circuit Court of the Twentieth Judicial Circuit in and for Lee County, Florida.  This Petition was subsequently dismissed because of the inability to obtain service of process upon Petitioner.  The testimony also shows that Petitioner sought help from the Mexican Central Authority in September 2012.

Respondent testified that he had intended to send B.T.R. back to Mexico in December 2012, but could not locate Petitioner by telephone or with messages.  Respondent therefore did not sent B.T.R. to Mexico, and continued the dental treatments in Florida. Respondent testified that it was not until B.T.R.'s birthday on September 23, 2013, that Petitioner sent B.T.R. a message on his cell phone.

Petitioner testified that she currently speaks to B.T.R. two or three times a week through Facebook.  B.T.R. tells Petitioner that he is doing very well in school and has friends, but misses his little brother a lot, and sometimes asks Petitioner to send his brother back to the United States.

Additional facts and resolution of material conflicts in the testimony will be set forth as necessary to resolve various issues.

### III.

### A.   Respondent's Paternity Rights

As a preliminary matter, the Court finds that the paternity rights of Respondent, although not mentioned by the parties, merit some discussion.

It is undisputed that Petitioner was legally married to another person in Mexico at the times B.T.R. was conceived and born in the United States.  It is also undisputed that Respondent is the biological father of B.T.R., that Respondent's name was listed as "father" on B.T.R.'s birth certificate, that Petitioner and Respondent did not marry because they knew Petitioner was already married, and that Petitioner's husband had no involvement with Petitioner or B.T.R. in the United States or in raising B.T.R. Respondent has always acted as and been represented to be B.T.R.'s father, has acknowledged responsibility for support, and is the only father B.T.R. has ever known.

Under Florida law, there is a strong presumption "that a man married to the biological mother is in fact the legal father of the child. This presumption is one of the strongest rebuttable presumptions known to law and is based on the child's interest in legitimacy and the public policy of protecting the welfare of the

child." G.T. v. A.E.T., 725 So. 2d 404, 410 (Fla. 4th DCA 1999). The mother's husband at the time of a child's birth is considered to be the child's "legal" father, regardless of whether he is the biological father. Slowinski v. Sweeney, 64 So. 3d 128, 129 (Fla. 1st DCA 2011).  Under Florida law, paternity is established in the husband as a matter of law when "the child is born to an intact marriage and recognized by the husband as his own child."  Id. (citing Lander v. Smith, 906 So. 2d 1130, 1131 n.1 (Fla. 4th DCA 2005)).

In this matter, Petitioner was lawfully married to another at the time of B.T.R.'s birth; thus, Petitioner's husband is considered the legal father of B.T.R. at the time of his birth. There is, however, no evidence indicating that Petitioner's marriage was intact or that her husband recognized the child as his own.  Indeed, the evidence establishes that the marriage was not intact and there is no evidence that the husband recognized B.T.R. as his own or even knew of his existence.  To the contrary, the evidence shows that Respondent has acted as B.T.R's father and had his name entered on B.T.R.'s birth certificate as the father.[8]

_____

[8]Florida law provides that the name of the mother's husband at the time of birth shall be entered on the birth certificate as the father of the child, unless paternity has been determined otherwise by a court of competent jurisdiction.  Fla. Stat. § 382.013(2)(a).  If the mother is not married at the time of birth, the name of the father may not be entered on the birth certificate without the execution of an affidavit signed by both the mother

Both parties acknowledged that Respondent was the father of B.T.R. at the time of birth and no subsequent challenge to Respondent's paternity rights has been made. Accordingly, the Court finds that Respondent is B.T.R.'s biological father and has the attendant rights of a parent, D.M.T. v. T.M.H., 129 So. 3d 320, 334-35 (Fla. 2013), including the ability to asserts his parental rights concerning B.T.R. in this Hague Convention case.

B.    **Petitioner's Case:**

Petitioner asserts Respondent wrongfully removed B.T.R. from the Republic of Mexico and has wrongfully retained him in the United States. The two threshold issues in any Hague Convention case are easily satisfied. The evidence shows, and the parties agree, that the child is under 16 years of age. It is also clear that the Republic of Mexico and the United States became signatories to the Hague Convention prior to the events at issue in this case. Seaman v. Peterson, 766 F.3d 1252, 1254 n.1 (11th Cir. 2014) ("The United States and Mexico are both signatories to the Convention."). The remaining requirements are discussed below:

---

and the person to be named as the father. Fla. Stat. § 382.013(2)(c). Accordingly, the person in charge of the hospital, in preparing the birth certificate for filing, could not have named Respondent as the father unless Petitioner and Respondent executed an affidavit or acknowledgement of paternity. See Fla. Stat. §§ 382.013(1), 382.013(2)(c). See also Flores v. Sanchez, 137 So. 3d 1104, 1108 (Fla. 3d DCA 2014).

**(1)  Habitual Residence of the Child**

Petitioner must establish that B.T.R.'s habitual residence was Mexico at the time of the alleged removal or retention.  Hague Convention art. 3.  This requires the Court to first determine when the alleged wrongful removal or retention took place, because the only point in time when habitual residence is relevant under the Hague Convention is immediately before the removal or retention.  Barzilay v. Barzilay, 600 F.3d 912, 918 (8th Cir. 2010).  Here, the evidence shows that Respondent failed to return B.T.R. to Mexico on August 21, 2012, as originally agreed.  Evidence the Court finds credible establishes that Petitioner did not consent or acquiesce to the extension of B.T.R.'s stay in Florida beyond this date.  The issue therefore becomes the location of B.T.R.'s habitual residence as of on or about August 21, 2012.

Neither the Hague Convention nor ICARA define habitual residence.  Rather than a definition, the Eleventh Circuit has adopted a two-part framework to assist in the habitual residence analysis.  Seaman v. Peterson, 766 F.3d 1252, 1258 (11th Cir. 2014); Chafin, 742 F.3d at 938; Ruiz, 392 F.3d at 1253-54 (adopting the approach set forth in Mozes v. Mozes, 239 F.3d 1067 (9th Cir. 2001)).  The first step focuses on the existence or non-existence of a settled intention to abandon the former residence in favor of

a new residence.  Seaman, 766 F.3d at 1258.  The settled intention
of the parents does not need to be present at the time of departure,
as it could develop during the course of a stay originally intended
to be temporary.  Ruiz, 392 F.3d at 1252.  "[I]n the absence of
settled parental intent, courts should be slow to infer from such
contacts [with the new residence] that an earlier habitual
residence has been abandoned."  Ruiz, 392 F.3d at 1253 (quoting
Mozes, 239 F.3d at 1081).  See also Chafin, 742 F.3d at 938.

    The second question considered in determining habitual
residence is whether there was an actual change in geography
coupled with the passage of a sufficient length of time for the
child to have become acclimatized.  Seaman, 766 F.3d at 1258;
Chafin, 742 F.3d at 938; Ruiz, 392 F.3d at 1254.  Even when there
is not settled intent on the part of the parents to abandon the
child's prior habitual residence, a court may find a change in
habitual residence "if the objective facts point unequivocally to
a new habitual residence, or if the court could 'say with
confidence that the child's relative attachments to the two
countries have changed to the point where requiring a return to
the original forum would now be tantamount to taking the child out
of the family and social environment in which its life has
developed.'"  Ruiz, 392 F.3d at 1254 (quoting Mozes, 239 F.3d at
1081).

Here, the evidence undisputedly shows that B.T.R.'s original habitual residence was in Florida from the time of his birth until August 2008, when Petitioner took him to Mexico.  The testimony of Petitioner and Respondent was, perhaps not unexpectedly, in conflict on whether the parties intended to abandon Florida in favor of Mexico as a habitual residence.  Petitioner testified that Respondent knew her return to Mexico was to be permanent, and that Respondent was going to join them in December 2008.  Respondent, on the other hand, testified that Petitioner agreed that the trip to Mexico would be temporary, and denied that he expressed an intent to return to Mexico.  The Court need not resolve this factual dispute because the Court finds that the credible testimony establishes that Respondent acquiesced in Mexico as the habitual residence of the children.

"Subsequent acquiescence requires more than an isolated statement to a third-party.  Each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights . . . acquiescence under the convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period."  <u>Friedrich</u>, 78 F.3d at

1070.  <u>See</u> <u>also</u> <u>Mendez Lynch v. Mendez Lynch</u>, 220 F. Supp. 2d 1347, 1361 (M.D. Fla. 2002).

The evidence shows that Respondent had a consistent attitude of acquiescence over a significant period to time.  Respondent knew where Petitioner was residing in Mexico, but made no attempt to secure the children's permanent return to Florida.  By August 2012, even Respondent viewed Mexico as B.T.R.'s habitual residence.  Respondent testified that he requested B.T.R. be sent to Florida for "vacation," purchased a <u>roundtrip</u> plane ticket for B.T.R., initially intended to send B.T.R. back to Mexico once the dental care was complete, and stated that he only reason he failed to do so was because he could not contact Petitioner.

B.T.R.'s 2008 relocation to Mexico undisputedly constitutes an actual change in geography, which was coupled with a stay of sufficient duration to result in acclimation by the child.  The evidence shows that B.T.R. arrived in Mexico in August 2008 and did not return to Florida until June 2012, nearly four years later.  While in Mexico, B.T.R. attended school and church, developed familial relationships, maintained friendships with other children, played team sports, had a pet, and spoke primarily in Spanish.  Because there is proof of acquiescence, a change in geography, and B.T.R.'s acclimation over the passage of a substantial amount of time, the Court finds that Petitioner has

established by a preponderance of the evidence that B.T.R.'s habitual residence on or about August 21, 2012, was Hidalgo, Mexico.

**(2) "Removal" and "Retention" of the Child**

Petitioner must also establish that there has been a "removal" or "retention" within the meaning of the Hague Convention. A child is removed or retained within the meaning of the Hague Convention if the child has been removed or prevented from returning to his usual family and social environment. Pielage, 516 F.3d at 1287. See also Karkkainen v. Kovalchuk, 445 F.3d 280, 291 (3d Cir. 2006). Here, the evidence does not show that Respondent removed the child from his habitual residence, since Petitioner voluntarily sent B.T.R to Florida. The evidence does, however, show that B.T.R. was retained in the United States without Petitioner's permission after August 21, 2012. Respondent refused to return the child to Mexico, and attempted to obtain custody of the minor child by filing suit in Lee County, Florida. Accordingly, the Court finds that there was a retention of B.T.R. within the meaning of the Hague Convention from August 21, 2012, forward.

**(3) "Wrongful" Retention of the Child**

The Court must next determine whether the retention was wrongful. Pielage, 516 F.3d at 1287. Not every retention is

wrongful; retention is wrongful under the Hague Convention only
where it is in breach of rights of custody attributed to the non-
retaining party.   Id. at 1288.   "The existence of 'rights of
custody' are determined by the law of the country in which the
child habitually resides at the time of removal."   Hanley v. Roy,
485 F.3d 641, 645 (11th Cir. 2007).   The Eleventh Circuit also
emphasized that:

> [i]t is crucial to note that the violation of a *single*
> custody right suffices to make removal of a child
> wrongful.  That is, a parent need not have "custody" of
> the child to be entitled to return of his child under
> the Convention; rather, he need only have one right of
> custody.  Further, he need not have a *sole* or even
> *primary* right of custody.

Id. at 647 (emphasis in original).

Petitioner argues that her "right to custody" is established
by the Mexican doctrine of *patria potestas* (parental
authority/responsibility), as codified in the Civil Code for the
State of Hidalgo, Mexico.  (See Doc. #27.)  The Court agrees.

The doctrine of *patria potestas* provides parents with certain
rights and responsibilities regarding their children, including
the custody and care of the children.  See Section One, Title
Fifth, Article 489 of the Civil Code for the State Hidalgo ("When
both parents have recognized a child born out of wedlock and they
live together, they will jointly exert parental
authority/responsibility (*patria potestas*).").  Section One,

Title Fifth, Article 491 of the Civil Code for the State Hidalgo states that "When the parents of a child born out of wedlock separate and in the case the parents cannot agree on the matter, the judge will designate which parent will exert parental authority/responsibility (*patria potestas*), always considering the best interest of the child." (Doc. #27, p. 3.)

Here, the evidence amply establishes that Petitioner and Respondent have not agreed to the terms of exertion of parental authority/responsibility over B.T.R. and that the matter has not been decided by a judge. Thus, the Court finds that the rights and obligations provided by the doctrine of *patria potestas* create a "right of custody" and concludes that the rights and obligations of Petitioner have not been severed. Most other courts have concluded that the doctrine indeed confers such rights. See Whallon v. Lynn, 230 F.3d 450, 458 (1st Cir. 2000); Garcia v. Angarita, 440 F. Supp. 2d 1364, 1379 (S.D. Fla. 2006); Lalo v. Malca, 318 F. Supp. 2d 1152, 1154 (S.D. Fla. 2004); Mendez Lynch, 220 F. Supp. at 1358. The Court therefore concludes that the evidence in this case establishes that Petitioner had a right of custody of B.T.R. at all relevant times and that Respondent's retention of the child was wrongful under the Hague Convention.

**(4)  Petitioner's Exercise of Custody Rights**

While the Hague Convention does not define the "exercise" of rights of custody, the Sixth Circuit has stated that "[t]he only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." Friedrich, 78 F.3d at 1065.  The court went on to "hold that, if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child."  Id. at 1066.  See also Pesin v. Rodriguez, 77 F. Supp. 2d 1277, 1286–87 (S.D. Fla. 1999).

Petitioner has established she was exercising her rights of custody at the time the child was wrongfully retained.  As detailed above, B.T.R. lived with Petitioner for nearly four years before visiting his father in Florida, and Petitioner exercised all the normal functions of a parent, including her right to consent to the child's travel.  This clearly amounts to exercising one's custody rights.  Furthermore, Petitioner testified that she attempted to illegally enter United States to retrieve her son, and upon failing to do so, sought help from the Mexican Central

Authority.   This conduct supports Petitioner's position that she did not abandon the child or acquiesce in his continued presence in the United States.   Accordingly, Petitioner has met her burden of establishing that B.T.R. was wrongfully retained by Respondent and should be returned to Mexico, his habitual place of residence.

## C.   Respondent's Affirmative Defenses

Having satisfied the burden of establishing a prima facie case of wrongful retention, the child must be returned to his State of habitual residence unless Respondent can establish an affirmative defense.   The mandated return of a wrongfully retained child is subject to six exceptions, all of which are to be applied narrowly.   Rydder v. Rydder, 49 F.3d 369, 372 (8th Cir. 1995). The exceptions raised by Respondent are discussed below.

### (1)  Not Exercising Rights of Custody

A court is not bound to order the return of a child if the respondent demonstrates by a preponderance of the evidence that the person having care of the child was not exercising rights of custody at the time of the removal or retention of the child. Hague Convention, art. 13(a); 22 U.S.C. § 9003(e)(2)(B).   The Court has already found that Petitioner has established by a preponderance of the evidence that she was exercising her rights of custody regarding B.T.R. at the time of the wrongful retention.

Accordingly, this affirmative defense has not been established by Respondent.

**(2)   Petitioner's Consent/Subsequent Acquiescence**

A court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence that the person having care of the child had consented to or subsequently acquiesced in the removal or retention of the child. Hague Convention art. 13a; 22 U.S.C. § 9003(e)(2)(B).   "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005).

Respondent argues that Petitioner's failure to communicate with B.T.R. after the retention constitutes acquiescence.   The Court disagrees.   As stated earlier, "acquiescence under the convention requires either: an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period." Friedrich, 78 F.3d at 1070.   Under this subjective view of acquiescence, Mendez Lynch, 220 F. Supp. 2d at 1361, it is clear that Petitioner never acquiesced to the retention of the child in Florida after August

21, 2012.  The evidence shows that Petitioner demanded the return of the child from Respondent, tried to enter the United States illegally to retrieve her son, and upon failure, sought help from the Mexican Central Authority.  Accordingly, the Court finds that this exception has not been established.

**(3)  Wishes of the Child**

A court is not bound to order the return of a child if respondent demonstrates by a preponderance of the evidence that "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."  Hague Convention, art. 13; 22 U.S.C. § 9003(e)(2)(A). This provides a separate and independent basis for a court to refuse to return a child to the country of habitual residency, Blondin v. Dubois, 238 F.3d 153, 166 (2d Cir. 2001); however, this exception, like the others, is narrowly applied.  England, 234 F.3d at 272.

The evidence in this matter clearly establishes that B.T.R. does not want to go back to Mexico.  In fact, Petitioner herself testified that B.T.R. asked her to send his brother K.T.R. to Florida.  B.T.R. is only eleven years old, and by all accounts has a tendency to be untruthful.  The Court finds that the entirety of the evidences shows that B.T.R. has not attained a sufficient degree of maturity to warrant consideration of his opinion.

Furthermore, the Court finds that the objectives of the Hague Convention outweigh the minor child's wishes, even if fully considered.

**(4)  The Child's Adjustment to His New Environment**

A court is not obligated to return a child when return proceedings are commenced a year or more after the alleged removal or retention and it is demonstrated that the child is settled in its new environment.  Hague Convention, art. 12; 22 U.S.C. § 9003(e)(2)(A).  Equitable tolling of this time limitation is not available.  Lozano v. Montoya Alvarez, 134 S. Ct. 1224, 1232 (2014).

This action was commenced on July 14, 2014, about ten months after the expiration of the one year period following the wrongful retention of the minor child which began on August 22, 2012.  Thus, the Court must determine whether B.T.R. is settled in his new environment.

Courts may consider any relevant factor concerning a child's living arrangements in determining whether a child is now settled in his new environment.  See Lops, 140 F.3d at 946.  The United States State Department has stated that "nothing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof."  Wigley v. Hares, 82 So. 3d 932, 941 (Fla. 4th DCA

2011) (citation omitted).  Factors which may be considered include the child's age; the stability and duration of the child's residence in the new environment; whether the child attends school consistently; the stability of the retaining parent's employment and financial circumstances; whether the child has friends and relatives in the new area; whether the child participates in community or extracurricular school activities; the child's immigration status; Respondent's immigration status; whether the child has been concealed in his new location; and the reasons for the delay in initiating the petition for the child's return.  See Wigley, 82 So. 3d at 941-42; Lopez v. Alcala, 547 F. Supp. 2d 1255, 1259 (M.D. Fla. 2008); Mendez Lynch, 220 F. Supp. 2d at 1363.  A more comfortable material existence, however, is not dispositive of the child being well settled.  Lops, 140 F.3d at 946.

In the instant case, the evidence shows that almost all factors favor a finding that B.T.R. is now settled in Lee County, Florida.

B.T.R. is eleven years old and has lived in Florida for approximately seven years of his life.  He has currently resided in Florida since August 12, 2012, and lives with his father, stepmother, and stepsister as a typical family unit in a suitable residence.  B.T.R. is involved in a very stable living arrangement with his biological father and his new family.  B.T.R. has lived

in the same residence, in which he has his own room, for a majority
of the time since he returned to Florida.  B.T.R. attends school
regularly and has done so since his return to the United States in
2012.  The evidence indicates that B.T.R. struggled with school
upon his return to Florida due to language barriers, but B.T.R.,
with the help of his stepmother, has worked to garner a better
understanding of the English language, resulting in significant
improvements at school.  B.T.R. has made new friends at school and
in his neighborhood and has developed strong relationships with
his stepmother and step-siblings.  Respondent has lived in the
United States since 1999, currently works as a day laborer, has
filed a U.S. Income Tax return, and is currently married to an
American citizen.  Although Respondent's immigration status is
currently that of an illegal alien, he has taken steps to secure
a permanent United States visa.  There is nothing to suggest that,
at this moment, or in the near future, the immigration status of
Respondent is likely to upset the stability of the child's life
here in Florida.  B.T.R. is a United States citizen, and as such
is not subject to deportation.  Under the circumstances, the Court
finds that B.T.R. is well-settled in Florida and that any
uncertainty caused by Respondent's immigration status is minimal.
See Lozano v. Alvarez, 697 F.3d 41, 56 (2d Cir. 2012) (holding
that the lack of legal immigration status does not preclude a court

from finding a child to be settled); <u>In re B. Del C.S.B.</u>, 559 F.3d 999, 1010 (9th Cir. 2008) ("only in a case in which there is an immediate, concrete threat of removal can immigration status constitute a significant factor with respect to the question whether a child is 'settled.'"). The new location was never concealed from Petitioner, and has been a matter of public record since at least the September 2012 filing of the Paternity Petition. The only reason stated by Petitioner for the delay in initiating the petition for the child's return was time to find an attorney to handle the matter.

The Court finds that Respondent has established by a preponderance of the evidence that this action was initiated more than a year after the wrongful retention of B.T.R., and that B.T.R. is now well-settled in his new location. The Court further finds, in the exercise of its discretion, that the return of the minor child is therefore not warranted.

Accordingly, it is hereby

**ORDERED:**

1.   Petitioner's Petition for Return of Minor Child (Doc. #1) is **DENIED.**

2.   The Clerk of the Court is directed to release any documents surrendered by Respondent to counsel for Respondent or Respondent.

3.    The   Clerk   is   further   directed   to   enter   judgment accordingly,  terminate  all  pending  motions  and  deadlines,  and close the case.

**DONE and ORDERED** at Fort Myers, Florida, this ___11th___ day of December, 2014.

JOHN E. STEELE
UNITED STATES DISTRICT JUDGE

Copies:

Counsel of Record